STOWERS, Chief Justice, dissenting.
I cannot join the court's decision because I disagree both with the court's premise and its answer to its analytical first step: "to decide what the [negotiated rate] differential represents."[1] The court's premise assumes (petitio principii ) the answer to the question it seeks to resolve: "Is [the differential] part of the benefit that an injured party receives from the collateral source?"[2] Specifically, the question assumes that there is a benefit to the plaintiff and that it is from a collateral source. But this is not so. "The benefit of insurance to the insured is the payment of charges owed to the health care provider. An adjustment in the amount of those charges to arrive at the amount owed is a benefit to the insurer , one it obtains from the provider for itself, not for the insured ."[3] Notwithstanding, the court answers its question: "[t]he amount discounted out of a medical bill is part of the value of that collateral benefit and should not accrue to the defendant."[4] In light of the *1030 foregoing, it is evident this answer misses the mark.
I also disagree with the court's proposition that Medicare "settled" Weston's hospital bills for a lower amount;[5] there was no true "settlement" because both sides had to know that the originally billed amounts bore no relation to the fair market value of the treatment Weston received. Finally, the court "conclude[s] that the amounts billed by the providers are relevant evidence of the medical services' reasonable value."[6] As shown below, there is nothing reasonable about the intentionally inflated and knowingly fictitious prices charged by the healthcare providers, and these inflated billings are not relevant to any issue in Weston's personal injury case.
Fair market value is the price that a willing buyer and a willing seller would exchange for a good or service.[7] In healthcare, prices are set in a different way. Each hospital maintains a massive price list known as a "chargemaster."[8] "[T]hese chargemaster list prices are exorbitant. They are not set by the hospital to be paid; rather, they are set to be discounted in negotiations with insurance companies and to game the Medicare reimbursement system."[9] As a mammoth government insurer, Medicare is a "price setter" that can press its payments down toward a hospital's breakeven point.[10]
Thus, from the start the hospital was only going to receive what Medicare determined it would pay for Weston's treatment. The hospital "billed" over $135,000 for this treatment, but it likely never intended or expected to collect that amount from Medicare, Weston, or anyone else.[11] For example: the record contains an itemized list of every good and service Weston consumed during her hospitalization, including medications such as enoxaparin (40 mg), morphine (30 mg), and ondansetron (2 mg/ml). For a single dose of these medications the hospital billed Weston $240.95, $1104.00, and $65.40, respectively. As AKHappytime demonstrated to the superior court, these prices are orders of magnitude higher than the median wholesale prices of these drugs on the international market. And as historical practice predicted,[12] Medicare paid less than one-fifth of what the hospital billed for Weston's medical care.[13]
Weston is entitled to pursue compensation for the medical treatment she received, but she must establish "some reasonable basis" for valuing that care.[14] Her claims for medical treatment must be based on some reasonable semblance of a fair market value of the goods and services she received-a market value evidenced by what is typically paid by Medicare, one of the largest insurers in the healthcare market[15] -not on some grossly inflated, fictitious amount billed.
Finally, the collateral source rule does not come into play at all with respect to the negotiated rate differential, because there is no collateral source payment . Weston's damages *1031 are not being reduced or mitigated on account of payments from a source other than the defendant; Weston's medical bills were paid at the Medicare rate and, most importantly, she did not incur any liability for the difference between the rates actually paid and the fictitious, inflated rates initially charged. To repeat what was stated at the outset, "The benefit of insurance to the insured is the payment of charges owed to the health care provider. An adjustment in the amount of those charges to arrive at the amount owed is a benefit to the insurer , one it obtains from the provider for itself, not for the insured ."[16]
I cannot endorse the court's adoption of a known fiction. The amount originally billed by the healthcare providers has no rational relationship to the economic realities of modern healthcare payment practices. I would affirm the superior court's order limiting Weston to showing "the adjusted medical rates accepted by her providers as full and final payment for medical services rendered," and therefore I dissent.

Patchett v. Lee , 60 N.E.3d 1025 (Ind. 2016).

Compare id. at 1031 with 42 U.S.C. § 1395cc(a)(1), (b) (2018).

Patchett , 60 N.E.3d at 1031.

Id.

See id. at 1029 (" '[T]he collateral source statute does not bar evidence of discounted amounts in order to determine the reasonable value of medical services', if insurance is not referenced." (quoting Stanley v. Walker , 906 N.E.2d 852, 858 (Ind. 2009) )); see also Martinez v. Milburn Enters., Inc. , 290 Kan. 572, 233 P.3d 205, 222-23 (2010) ("[T]he collateral source rule bars admission of evidence stating that the expenses were paid by a collateral source. However, the rule does not address, much less bar, the admission of evidence indicating that something less than the charged amount has satisfied ... the amount billed."); Scott v. Garfield , 454 Mass. 790, 912 N.E.2d 1000, 1014 (Mass. 2009) (Cordy, J., concurring) ("[T]he plaintiff is only entitled to the reasonable value of his medical expenses, and the price that a medical provider is prepared to accept for the medical services rendered is highly relevant to that determination."); Robinson v. Bates , 112 Ohio St.3d 17, 857 N.E.2d 1195, 1200 (2006) ("[T]he reasonable value of medical services is a matter for the jury to determine from all relevant evidence. Both the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness ... of charges rendered for medical and hospital care.").

See Op. at 1027-28.

See Alaska R. Evid. 105 ("When evidence which is admissible ... for one purpose but not admissible ... for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."); see also Martinez , 233 P.3d at 225-27.

George A. Nation III, Determining the Fair and Reasonable Value of Medical Services: The Affordable Care Act, Government Insurers, Private Insurers and Uninsured Patients , 65 Baylor L. Rev. 425, 427 (2013).

George A. Nation III, Hospitals Use the Pernicious Chargemaster Pricing System to Take Advantage of Accident Victims: Stopping Abusive Hospital Billing , 66 Drake L. Rev. 645, 652-53 (2018) [hereinafter Hospitals ].

Id. at 655, 661.

See id. at 651-52 ("On average, hospitals receive only 33 percent of their chargemaster prices from all payers."); Mark A. Hall & Carl E. Schneider, Patients As Consumers: Courts, Contracts, and the New Medical Marketplace , 106 Mich. L. Rev. 643, 664 (2008) ("Undiscounted charges are often three or four times the rates given insurers, and there are 'contracts where the discount from list price was over [ninety] percent.' ").

Hospitals , supra note 9, at 652-53.

The hospital billed Weston over $135,000; Medicare paid those bills in full for $24,247.45, approximately 18% of the billed amount.

Alexander v. State, Dep't of Corr. , 221 P.3d 321, 324 (Alaska 2009) (quoting City of Fairbanks v. Nesbett , 432 P.2d 607, 616 (Alaska 1967) ).

Hospitals , supra note 9, at 655, 661.

Haygood v. De Escabedo , 356 S.W.3d 390, 395-96 (Tex. 2011) (emphasis added).